■ In the Matter of ROKHAYA CISSE, Appellant, v CHRISTO-PHER GRAHAM, Respondent. (Proceeding No. 1.) In the Matter of CHRISTOPHER GRAHAM, Respondent, v ROKHAYA CISSE, Appellant. (Proceeding No. 2.) [991 NYS2d 465]—

In two related proceedings pursuant to Family Court Act article 6, the mother appeals from an order of the Family Court, Queens County (Negron, Ct. Atty. Ref.), dated April 5, 2013, which, among other things, after a hearing, granted the father's petition to modify a prior order of custody and visitation of the same court (Clark, J.) dated June 30, 2004, so as to award him custody of the parties' child, and denied her petition, in effect, to modify the visitation provisions of that order.

Ordered that the order dated April 5, 2013, is affirmed, with costs.

To warrant modification of an existing court-sanctioned custody arrangement, there must be a showing of a change in circumstances such that modification is required to protect the best interests of the child (see Family Ct Act § 652 [a]; *Matter of Begy v Begy*, 115 AD3d 951 [2014]; *Matter of Hixenbaugh v Hixenbaugh*, 111 AD3d 636, 637 [2013]; *Matter of Quintanilla v Morales*, 110 AD3d 1081 [2013]). We recognize, as does the dissent, that the authority of the appellate court is as broad as that of the Family Court, and that simple deference to the Family Court's findings would be an abdication of our authority (see *Matter of Fallo v Tallon*, 118 AD3d 991 [2014]). However, we may not substitute our judgment for that of the hearing court where its custody determination depended upon its assessment of the credibility of the witnesses, and those determinations, as well as its findings as to a change in circumstances and the best interests of the child, are founded on a sound and substantial basis in the record, as they are here (see *Matter of Quintanilla v Morales*, 110 AD3d at 1081-1082; *Matter of Cornejo v Salas*, 110 AD3d 1068 [2013]).

Here, although the order appealed from determines the father's petition to modify a prior order of custody and visitation dated June 30, 2004 (hereinafter the 2004 custody order), which was entered upon the stipulation of the parties, we are also reviewing the Family Court's denial of the mother's petition, in effect, to modify the visitation provisions of that order. In that regard, it is worth noting that the mother alleged, inter alia, that a change in circumstances had occurred since the entry of the 2004 custody order in that the parties' child had since been enrolled at a school in Manhattan, the father had

moved from Queens to Suffolk County, and the mother had changed jobs. Accordingly, she cannot now be heard to complain that there was no change of circumstances. The mother contended that the visitation provisions needed to be modified so as to be "conducive to [the child's] academic schedule." The evidence at the hearing established that there had indeed been a change in circumstances, as alleged by the mother. Furthermore, the evidence in the record supports the Family Court's finding that in the intervening years since the issuance of the 2004 custody order, the child, who was 12 years old at the time the order appealed from was issued, "has matured and made clearer her needs, her desires, and bases for those desires." Finally, the record supports the Family Court's determination that the best interests of the child would most likely be accomplished by a change of custody and affording the mother a liberal and well-defined schedule of visitation. After a thorough recitation of the testimony of the various witnesses, save for the in camera examination of the child (see Matter of Lincoln v Lincoln, 24 NY2d 270 [1969]), and an evaluation of the credibility of the witnesses, the Family Court's well-reasoned decision and order offers the mother the opportunity to accomplish precisely what she sought in her petition and what she and the child desire, which is the opportunity to spend more quality time with each other.

Contrary to the mother's contention, which the dissent apparently accepts, that the Family Court focused on incidents remote in time and penalized her for being a working mother, the Family Court properly considered the totality of the circumstances in making its findings (see Eschbach v Eschbach, 56 NY2d 167, 171 [1982]; Matter of Hixenbaugh v Hixenbaugh, 111 AD3d at 637). In so doing, the court weighed several factors in varying degrees of importance, as demanded by the facts of this case, "including, inter alia, (1) the original placement of the child, (2) the length of that placement, (3) the child's desires, (4) the relative fitness of the parents, (5) the quality of the home environment, (6) the parental guidance given to the child, (7) the parent's financial status, (8) his or her ability to provide for the child's emotional and intellectual development, and (9) the willingness of the parent to assure meaningful contact between the child and the other parent" (Matter of Mingo v Belgrave, 69 AD3d 859, 859-860 [2010]; see Cuccurullo v Cuccurullo, 21 AD3d 983, 984 [2005]).

Under the terms of the 2004 custody order, the mother was awarded custody, and the father was awarded extensive, well-defined visitation. The child resided with the mother, and the

father's visitation, as relevant to the parties' petitions, included the first, third, and fifth (where applicable) weekend of each month, commencing on Friday, after school, until Sunday evening, as well as Tuesday and Thursday evenings following school until 8:00 p.m. The order appealed from, at its core, reverses those terms such that the father has custody of the child, subject to the mother's substantially similar visitation on the first, third, and fifth (where applicable) weekends of the month and two weekday visits from the close of school until 8:30 p.m. and during other secular and religious holidays.

The Family Court properly considered the father's testimony that there were instances early on, under the 2004 custody order, when the mother substantially interfered with his ability to visit with the child and that she failed to provide him access to academic records and inform him of school-related activities (see Bliss v Ach, 56 NY2d 995, 998 [1982]; Matter of Tori v Tori, 67 AD3d 1021 [2009]; Matter of Lovitch v Lovitch, 64 AD3d 710, 712 [2009]; Falabella v Murray, 265 AD2d 450 [1999]). However, contrary to the mother's contention that the Family Court placed too much weight on such remote events, the court cited those events principally in the context of its evaluation of which parent was more likely to foster the child's relationship with the other. In that regard, the fact that the mother, by her petition, sought to reduce the father's visitation during the week, as well as on weekends, cannot be ignored. The Family Court credited the court-appointed forensic psychologist's opinion that, although the mother acknowledged the importance of fostering the child's relationship with the father, she had not demonstrated the ability to transform those words into deeds. The father, on the other hand, was found less likely to interfere with the child's relationship with the mother and more likely to address her emotional needs. Toward that end, it cannot be overlooked that the child expressed a significant bond with the father's wife (hereinafter the stepmother), who testified that she grew up in an environment involving stepparents, that she understands the child's feelings, and that she understands her role as a stepmother is not to supplant that of the mother.

Although the father moved to West Babylon, Suffolk County, where he currently resides with his wife and their three children, that move was not the genesis of the difficulties the child has encountered in developing the relationship with her mother that she desires. At the hearing, the mother acknowledged that her new work schedule and the child's school schedule leave little time for them to spend quality time together during the school/work week. The mother acknowledged that her work

schedule is not as flexible as it was at the time the 2004 custody order was issued. The mother enrolled the child at the United Nations International School (UNIS) in Manhattan, which requires early morning travel from the mother's home in Queens. As a result of the mother's work schedule and the child's enrollment in a school not in close proximity to the mother's home, on the days when the child is not visiting with the father, the child is either in aftercare or attending swimming lessons until approximately 6:00 p.m., when the mother picks her up and they travel home to Queens. Dinner and school work leave little time for social interaction between the mother and child. Although the mother attempted to minimize the amount of time during the evenings and weekends when she is required to attend to the demands of her job, the Family Court properly declined to credit this testimony in light of other credible evidence to the contrary, including the testimony of the forensic psychologist, who interviewed the child, and the testimony of the witnesses presented by the mother. The dissent's acceptance of the mother's account simply is not supported by the record. Indeed, it is contrary to accounts of the mother and the mother's sister concerning the time the mother spends with the child.

While the mother's attention to the demands of her job and her placement of a premium on the child's academics were acknowledged by the Family Court to be quite laudable, the record supports the court's determination that the mother failed to strike a proper balance between the child's academics and her need to socialize with her own peers. Indeed, the record establishes that the child has no play dates with her schoolmates and does not socialize with other children who reside in the LeFrak City community where she and the mother reside. The Family Court found this to be inexplicable, and specifically rejected the mother's contention that this was due to the father's extensive visitation schedule. More significantly, the record further establishes that the combination of the demands of the mother's work, her emphasis on academics, and her decision to enroll the child in a school far from the community in which she lives have actually interfered with the child's ability to spend quality time with the mother. Time at home with the mother is spent either studying or doing chores that cannot be accomplished during the week, and other time with the mother is spent visiting family in New Jersey. Frequently, the time the mother spends with the child on those family visits is limited, as the mother returns to New York to work while the child stays in New Jersey. To be sure, although the child loves her mother dearly, she is astute and was able to articulate to the fo-

rensic psychologist that even when she is in her mother's physical presence, she often felt alone.

Although a child's preferences are not determinative of how a court should decide questions of custody and visitation, they may be instructive as to what is in the child's best interests (*see Dintruff v McGreevy*, 34 NY2d 887, 888 [1974]; *Cieri v Cieri*, 56 AD3d 409, 410 [2008]). Here, the child desires to reside with her father, and expressed her hope that her mother would move to the West Babylon community as well. In contrast to her living and social environment in LeFrak City, the record demonstrates that her father and his family, even though limited to "visitation," provide a better home environment and better care for the child, and that the child perceives it as such. The stepmother's testimony that the child confides in her regarding social and school issues, even to the extent of discussing her relationship with the mother, was corroborated by the forensic psychologist, who testified that the child views her relationship with her half-siblings and her stepmother as a "safe haven." The close familial relationship the child has developed with her father, stepmother, and half-siblings should be encouraged, since, "[b]y building identity, countering feelings of isolation, and encouraging healthy adjustments to and with others, [it] provide[s] an important additional dimension to long-term stability" (*Matter of Ebert v Ebert*, 38 NY2d 700, 704 [1976]).

In addition, the child is well-integrated with the West Babylon community. The child gets along well with her half-siblings and their friends. She has her own friends in the community, attends her half-siblings' school events and sporting events, goes to church with the family, and takes religion and Irish stepdancing classes. This is quite simply the type of family and community socialization that she does not have when she is in the mother's home.

The record also supports the Family Court's rejection of the mother's contention that transfer of custody, with the attendant transfer from the UNIS school, would remove the child from a multicultural environment that the mother properly considers to be very important for a biracial child. The church that the family attends in West Babylon has one priest from Ghana and another from Korea. The record does not support the mother's contention that the UNIS school is any more diverse than the West Babylon school district, or that it is any better equipped to nurture the child's biracial identity. Further, the Family Court specifically cited an example wherein the stepmother and half-siblings supported the child's biracial identity. When the child purchased a figurine depicting a black dancer for her father for

Father's Day, one of the younger half-siblings followed suit by purchasing a black sports figurine for the father.

Although the recommendations of court-appointed evaluators and the attorney for the child are not determinative, they are factors to be considered and are entitled to some weight (*see Matter of Shannon J. v Aaron P.*, 111 AD3d 829, 831 [2013]; *Baker v Baker*, 66 AD3d 722, 723-724 [2009]; *Matter of Kozlowski v Mangialino*, 36 AD3d 916, 917 [2007]). Here, the attorney for the child took no position at the hearing but, on appeal, contends that evidence in the record provided a sound and substantial basis for the Family Court's determination. The forensic psychologist, like the mother and the child, was quite concerned that the child and mother have difficulty finding time to spend quality time together, especially during the week. Again, the child expressed a sense of loneliness when she is with the mother. The forensic psychologist opined that the mother's lack of attunement to the emotional needs of the child was evidenced by the mother's purchase of toys for the child to play with while the mother was at home attending to the demands of her job. It was his view that a change in the custodial and visitation arrangement should be made so that the child could spend more continuous quality time with each parent. The order appealed from strives to achieve that purpose. It recognizes that the father's work schedule as a teacher permits him to be home in the afternoon not long after the child will arrive home from school and that, rather than spending time in aftercare, as she does now, the child will be with the father and his family and socializing with her peers while still having time to attend to her academic pursuits. More significantly, the Family Court order offers the mother more weekend time with the child and the option for weekday visitation, with the hope that the mother's "lack of attunement" with the child will be ameliorated by the opportunity of more continuous one-to-one attention to the emotional needs of the child.

The order also addresses the forensic psychologist's concern with the mother's unwillingness to enroll the child in therapy, notwithstanding repeated encouragement to do so. The father has expressed a willingness to enroll the child in therapy, and the Family Court order makes a specific directive to that effect.

Since the Family Court's determination that there had been a sufficient change in circumstances requiring a change in custody to protect the best interests of the subject child is supported by a sound and substantial basis in the record, the court's determination will not be disturbed (*see Matter of Feliccia v Spahn*, 108 AD3d 702, 703 [2013]; *Matter of DeViteri v Saldana*, 95 AD3d

1221, 1222 [2012]; *Matter of Tori v Tori*, 67 AD3d 1021 [2009]; *Matter of Lovitch v Lovitch*, 64 AD3d at 712).

The mother's remaining contentions either are without merit or have been rendered academic in light of the foregoing. Skelos, J.P., Dillon and Maltese, JJ., concur.

Roman, J., dissents, and votes to reverse the order, deny the father's petition, and grant the mother's petition to the extent of remitting the matter to the Family Court, Queens County, to set forth a new visitation schedule, in accordance with the following memorandum: The Family Court's determination to award the father custody of the 13-year-old subject child, who has been raised by the mother since birth, lacks a sound and substantial basis in the record. The father failed to demonstrate that there had been a sufficient change of circumstances since the issuance of the prior custody order such that a modification of custody is required to protect the best interests and welfare of the child. Therefore, I respectfully dissent.

The record reveals that there are significant differences in the parties' cultural and religious backgrounds. The mother is a Muslim who was born in Senegal, and the father is a Roman Catholic. The parties, who were never married, have one child together, a daughter born on March 24, 2001. Their relationship ended before the birth of the child. In an order dated June 30, 2004 (hereinfter the 2004 custody order), the Family Court awarded custody of the child to the mother and visitation to the father, with the visitation to occur pursuant to a stipulation signed by the parties. In November 2007, the mother filed a petition to modify the father's visitation schedule to make visitation more "conducive to [the child's] academic schedule." In September 2008, the father filed a petition to modify the 2004 custody order so as to award him sole custody of the child. In his petition, the father alleged that there had been a change in circumstances in that the mother had frustrated his visitation rights, the child wished to reside with him, and the mother left the child in aftercare everyday until 6:00 p.m. Following a hearing, the Family Court issued an order transferring custody to the father, and the mother appeals. In September 2013, this Court stayed enforcement of the order appealed from pending hearing and determination of the appeal.

To modify an existing court-sanctioned custody arrangement, there must be a showing of a change in circumstances such that modification is necessary to ensure the continued best interests of the child (*see Matter of Dezil v Garlick*, 114 AD3d 773, 773 [2014]; *Matter of Sparacio v Fitzgerald*, 73 AD3d 790, 790 [2010]; *Matter of Russell v Russell*, 72 AD3d 973, 974 [2010]).

The best interests of the child are determined by a review of the totality of the circumstances (*see Eschbach v Eschbach*, 56 NY2d 167, 172 [1982]; *Matter of Sparacio v Fitzgerald*, 73 AD3d at 791). "Along with the factors considered in any custody determination, the court must also consider the stability and continuity afforded by maintaining the present arrangement" (*Gonzalez v Gonzalez*, 17 AD3d 635, 636 [2005]; *see Cervera v Bressler*, 90 AD3d 803, 805 [2011]). The authority of this Court in custody determinations is as broad as that of the hearing court (*see Matter of Orellana v Orellana*, 112 AD3d 720, 722 [2013]; *Matter of Moran v Cortez*, 85 AD3d 795, 796 [2011]), and while mindful that the hearing court has an advantage in being able to observe the demeanor and assess the credibility of witnesses, "[a]n appellate court would be seriously remiss if, simply in deference to the finding of a Trial Judge, it allowed a custody determination to stand where it lacks a sound and substantial basis in the record" (*Matter of Gloria S. v Richard B.*, 80 AD2d 72, 76 [1981]; *see Matter of Caruso v Cruz*, 114 AD3d 769, 772 [2014]; *Matter of James A.-S. v Cassandra A.-S.*, 107 AD3d 703, 706 [2013]).

Here, the Family Court's determination to transfer custody of the subject child, who was 12 years old at the time the order appealed from was issued, lacked a sound and substantial basis in the record. The Family Court failed to accord sufficient weight to the child's need for stability and to the impact of uprooting her from the care of her mother, with whom she has resided for her entire life, as well as removing her from her current home, school, and activities (*see Matter of Sidorowicz v Sidorowicz*, 101 AD3d 737, 738 [2012]; *Matter of Russell v Russell*, 72 AD3d at 974-975; *Matter of Larkin v White*, 64 AD3d 707, 709 [2009]). This Court has consistently recognized that " '[p]riority in custody disputes should usually be given to the parent who was first awarded custody . . . because this policy assures stability in the child's life' " (*Matter of Conway v Gartmond*, 108 AD3d 667, 668 [2013], quoting *Matter of Ross v Ross*, 96 AD3d 856, 857 [2012]; *see Matter of Sidorowicz v Sidorowicz*, 101 AD3d at 738; *White v Mazzella-White*, 84 AD3d 1068, 1069 [2011]; *Matter of Russell v Russell*, 72 AD3d at 974; *Matter of Ganzenmuller v Rivera*, 40 AD3d 756, 756 [2007]; *Matter of Salvati v Salvati*, 221 AD2d 541, 542 [1995]; *Matter of Lobo v Muttee*, 196 AD2d 585, 587 [1993]; *Richman v Richman*, 104 AD2d 934, 935 [1984]; *see also Friederwitzer v Friederwitzer*, 55 NY2d 89, 94 [1982]). Indeed, in an attempt to assure stability, this Court has declined to separate a child from the custodial parent even in cases where the child was much younger, and, thus, had been in the care of that parent for a far shorter period of time than the

subject child, who, as noted above, was 12 years old when the Family Court rendered its decision (*see e.g. Matter of Larkin v White*, 64 AD3d at 708-709 [in awarding the father sole custody, the hearing court failed to afford sufficient weight to the child's need for stability, where the child was six years old and the mother had been the child's primary caregiver since birth]; *Matter of Salvati v Salvati*, 221 AD2d at 542-543 [the Family Court failed to give sufficient weight to the facts that the child, who was almost four years old at the time of the hearing, had resided with his father for his entire life and that the father had been his primary caregiver even before the parties separated]; *see also Matter of Lobo v Muttee*, 196 AD2d at 587-588 [remitting for a new hearing and noting that the Family Court "failed to give sufficient weight to the fact that the child, who was five years old at the time of the hearing, had resided with his father his entire life and that the father had been the primary caretaker after the mother left the marital residence"]). Where, as here, "there is no indication that a change of custody will result in significantly enhancing the child's welfare, it is generally considered in the child's best interests not to disrupt his [or her] life" (*Matter of Salvati v Salvati*, 221 AD2d at 543; *see Matter of Ross v Ross*, 96 AD3d at 857; *Gonzalez v Gonzalez*, 17 AD3d at 636).

In this matter, the evidence at the hearing established that the child is well cared for by the mother, and that there is a strong bond between her and the child. The court-appointed forensic evaluator described the mother as a loving, dedicated, and nurturing parent "who is able to monitor and guide her child" and "clearly able to provide a stable environment," and the child reported having a good relationship with the mother. The evaluator noted in his report that "it could also be argued that as [the child] approaches adolescence [she] might benefit from her mother's wisdom and similar 'cultural' experience (i.e., being the product of two different cultures) as [the child] tries to negotiate her emerging sense of identity." By contrast, the father seemingly minimized the significance of these issues. As the Family Court recounted in its order, "[w]hen asked about bi-cultural and bi-racial issues the child faces, the father replied that the child's skin color is one component, much as red hair is one component of a person." Notably, the evaluator expressed concern about the "psychological repercussions" that a transfer of custody might have on the child and "the price she might pay."

Further, nothing in the record suggests that the father would be able to provide a better home environment or better care for

the child (*see e.g. Cervera v Bressler*, 90 AD3d at 805). The child resides with the mother in LeFrak City, Queens, in a three-bedroom apartment shared with her maternal grandmother, a budget coordinator for UNICEF, and her maternal grandfather, a retired editor for the United Nations. According to the forensic evaluator, the child reported feeling close to her maternal grandparents. The father, a school teacher in Queens County, currently resides in West Babylon, Suffolk County, with his current wife and their three children, who were ages eight, six, and four at the time the order appealed from was issued. At the mother's residence, the child has her own bedroom, which is significant as she enters adolescence. At the father's residence, however, the child shares a bedroom with her four-year-old half sibling. Additionally, the record suggests that the mother is better able to provide for the child's financial needs. The mother testified that she was earning $91,000 per year with the potential for an increase in annual salary to approximately $120,000. However, the record lacks evidence concerning the father's financial ability to provide for the child, in addition to his three other children.

The primary change in circumstances in this case since the issuance of the 2004 custody order was brought about by the father's decision to relocate to Suffolk County in approximately 2007. Significantly, while that order prohibited the mother from relocating with the child more than 25 miles from the location where she then resided, the father moved substantially in excess of that distance from Forest Hills, Queens, to West Babylon, Suffolk County, with his current wife to accommodate their growing family. The father's relocation created an unreasonable midweek travel schedule for the child, causing her to be driven for approximately 1½ hours twice a week to the father's home for visitation. As a result, the child often has to do her homework in the car. After visitation, the child is then driven home later in the evening. The forensic evaluator noted that the father did not appear to be aware of the toll that the weekday travel to West Babylon takes on the child. Thus, by her 2007 petition, the mother understandably sought to alleviate the child's travel burden by making visitation more conducive to the child's academic schedule. A court-ordered change in custody to the father was diametrically in opposition to the mother's request for a modification of the visitation schedule. The Family Court's determination transferring custody did not, contrary to the majority's suggestion, afford the mother, who has had custody of the child for her entire life, "precisely what she asked for in her petition."

Further, the mother cannot be faulted for having enrolled the

child at the Manhattan campus of the United Nations International School (UNIS), which the mother pays for without assistance from the father. The child has been enrolled at that school since entering kindergarten in September 2006, well before the father relocated to Suffolk County, and approximately two years before he filed his custody petition. Moreover, it is undisputed that the child is thriving academically. The forensic evaluator testified that UNIS appeared to be a good fit for the child since, as the mother stressed, UNIS emphasized diversity. Additionally, the mother had enrolled the child in extracurricular activities, including swimming, tennis, tap dancing, and soccer. The child was also participating in a school play and attending play rehearsals after school. The record also reflects that the child has established friendships at UNIS.

The Family Court stated that it did not fault the mother for her employment obligations and applauded her success. However, the court, in effect, unfairly penalized her for her career and work schedule. "[T]he custody-seeking mother who works outside the home should not be penalized for her employment, any more than should the father" (*Linda R. v Richard E.*, 162 AD2d 48, 55 [1990]). The mother, who attended Columbia University and Stony Brook University for her undergraduate studies, received her Master's Degree in financial engineering from Polytechnic Institute in January 2007, and subsequently became an associate analyst for Moody's Investors Service. At the time of the hearing, the mother was also studying for her Chartered Financial Analyst exams. She testified that her hours of employment were Monday through Friday, from approximately 9:00 a.m. to 5:00 p.m. Nevertheless, the mother was able to leave work at 3:00 p.m. on Mondays and Wednesdays to pick the child up from school and take her to Baruch College to be part of a swim team. Although the mother, at times, would work from home in the evening, she generally did so after the child went to bed. The child also enjoyed spending time with the maternal grandmother. There was testimony that the maternal grandmother's relationship with the child was "incredible," that they were "basically inseparable," and that they engaged in numerous activities together, including going to the nail salon, shopping, watching movies, and cooking. Under these circumstances, the evidence adduced at the hearing did not demonstrate that a change of custody was warranted based upon the mother's work schedule (*see Matter of Chery v Richardson*, 88 AD3d 788, 789 [2011]; *Matter of Moreau v Sirles*, 268 AD2d 811, 813 [2000]).

Further, it is not clear that the father is more likely than the

mother to foster a relationship between the child and the noncustodial parent. In his prior evaluation, the forensic evaluator found that the father had "impressed as struggling to contain a great deal of anger that he harbors towards the [mother]." Additionally, the evaluator stated that the father had, at times, appeared to "have acted out his anger against the [mother] in [a] retaliatory manner," and noted that the father's "filing for custody in the heels of [the mother's] filing for a modification of the visitation order could be interpreted as being consistent with such hypothesis." Significantly, although the parties stipulated that the child was to be exposed to both Catholic traditions and Muslim traditions, the father had the child participate in her First Communion without the mother's consent. This conduct, which was the subject of a prior appeal to this Court (see Matter of Cisse v Graham, 87 AD3d 1008 [2011]), reflects poorly on the father's ability to foster an appropriate relationship with the mother if awarded custody. Although the mother had previously interfered at times with the father's visitation, the record indicates that this issue was resolved well before the Family Court's determination (see Matter of Ross v Ross, 96 AD3d at 857-858; Cervera v Bressler, 90 AD3d at 805-806; Matter of Chery v Richardson, 88 AD3d at 789; Matter of Fallarino v Ayala, 41 AD3d 714, 715 [2007]). As the Family Court found, "[t]o the extent that the father alleges in his petition that the mother was interfering with his relationship, it appears that in recent years nothing has occurred giving rise to this claim."

Lastly, although the mother was reluctant to enroll the child in therapy, as recommended by the forensic evaluator, she attributed this reluctance to the fact that her own participation in therapy had been used against her and she did not want the same thing to happen to the child. Nevertheless, she testified that she was not opposed to the child participating in therapy, and had enrolled the child in a counseling program at her school. Moreover, it is noted that while the father asserts that the mother ceased the child's current therapy sessions, the mother maintains that the child is currently enrolled in ongoing therapy in Manhattan near her school.

The child has lived since her birth 13 years ago in her mother's home. Sole custody has rested with the mother for the entire 13-year span. The record reflects that the mother is a financially stable, upwardly mobile professional who has paid for and provided her daughter with a private school education at a school particularly attuned to the child's cultural and racial diversity. The child is thriving academically and has participated

in varied extracurricular activities. As noted above, the primary change in circumstances that occasioned the mother's petition to modify the visitation schedule was caused by the actions of the father. To meet the needs of his growing family, the father disregarded the 25-mile limitation that had been placed on any relocation by the mother, and moved out to Suffolk County. The father's relocation, which focused on improving the circumstances for his wife and their three young children, was not in any way made to address the needs or best interests of the child. In sum, no sound and substantial basis exists in this record for uprooting the child from the residence of her mother and the only school she has ever known. Accordingly, I would reverse the order, deny the father's petition, and grant the mother's petition to the extent of remitting the matter to the Family Court, Queens County, to devise a visitation schedule which reduces the weekday travel the child must endure between the father's house in West Babylon and the mother's residence in LeFrak City, but which allows for the continuation of the meaningful relationship between the father's family and the child (*see Mathie v Mathie*, 65 AD3d 527, 531 [2009]).