M.D. v K.D. (2024 NY Slip Op 50086(U))

[*1]

M.D. v K.D.

2024 NY Slip Op 50086(U)

Decided on January 26, 2024

Supreme Court, Westchester County

Patel, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 26, 2024
Supreme Court, Westchester County

M.D., Plaintiff,

against
K.D., Defendant.

Index No. [Redacted]

Patricia Bisesto, Esq. 
Devin L. Donohue, Esq. 
Co-Counsel for the mother, M.D.
Patricia T. Bisesto, Esq., Attorney and Counsellor at Law
470 Mamaroneck Ave, Suite 302
White Plains, NY 10605
Michele Lynne Bermel, Esq. 
Co-Counsel for the mother, M.D.
Michele L. Bermel, Esq.
39 Garden Ridge Rd, Suite 100
Chappaqua, NY 10514
John A. Pappalardo, Esq.
Samantha Rescigno, Esq. 
Counsel for the mother, K.D.
The Pappalardo Law Group PLLC
200 East Post Road 
White Plains, NY 10601

Anar Rathod Patel, J.

The Court presided over a three (3)-day non-jury trial in this matter on the following [*2]dates: April 13, 14, and 21, 2023, as to the relief sought in Plaintiff's Motion Sequence Number 1, and Defendant's Motion Sequence Numbers 2 and 3. Plaintiff is seeking an Order, inter alia, granting Plaintiff sole legal and physical custody of the parties' child, R.D., born [Redacted], with final decision-making authority and setting a fixed schedule of access between Plaintiff and Defendant (Mot. Seq. No. 1). Defendant is seeking an Order: (1) granting Defendant sole legal and physical custody of R.D., with final decision-making authority; (2) setting a fixed access schedule for Plaintiff (Mot. Seq. No. 2); (3) modifying the Judgment of Divorce dated December 3, 2019, and entered December 4, 2019, so as to terminate the Defendant's obligation to pay nine hundred dollars ($900.00) in monthly child support to Plaintiff retroactive to the date of the motion, as and for the support of R.D.; (4) granting Defendant the right of first refusal during her unemployment to be with R.D. during such time as Plaintiff is working during Plaintiff's access time; and (5) eliminating Defendant's obligation to pay childcare costs to Plaintiff's mother during the pendency of Defendant's unemployment (Mot. Seq. No. 3). Plaintiff was represented by [Redacted], Esq. and [Redacted], Esq. of the law firm of [Redacted], Esq., and [Redacted], Esq. of the law firm of [Redacted], Esq. Defendant was represented by [Redacted], Esq. and [Redacted], Esq. of [Redacted].
Pursuant to the Decision and Order of this Court dated November 14, 2022, these motions were granted to the extent of a hearing. NYSCEF Doc. Nos. 149-151. The Court bifurcated the trial as to the issues of change of circumstances and best interests of the child, and the financial issues related to any modification of child support. At trial, after Plaintiff rested on the issue of change of circumstances, Defendant made an application that—based upon Plaintiff's testimony—the Court find that a substantial change of circumstances had been established to warrant a hearing as to the best interests of the child. Both parties proffered arguments as to the issue of whether a substantial change of circumstances had been established. Tr. 4/14 at 77:2—86:19. The Court granted Defense counsel's application as to a substantial change of circumstances based on the following facts that have transpired since the parties entered into the Settlement Agreement: the child is now school age, Defendant is no longer employed as a police officer, Defendant relocated from Carmel to New Rochelle ("[Defendant's] relocation is, in some sense, an implied relocation as to the child"), and parties have encountered difficulties in co-parenting the child and resolving decisions jointly that concern R.D. Tr. at 87:9—90:5.
Accordingly, the hearing proceeded as to the best interests of the child. Although the Court scheduled additional hearing dates in May 2023, following the conclusion of the trial in April, Defense counsel advised the Court that Defendant rests and requested that all testimony taken during the change of circumstances hearing be consolidated into the best interests hearing. Plaintiff's counsel rested as to the issue of the best interests of the child at trial. Therefore, the instant Decision After Trial addresses the best interests analysis as to the parties' respective applications for a change of custody and access.
Parties filed the consolidated trial transcripts ("Tr.") on May 19, 2023, and post-trial memoranda on July 3, 2023. See NYSCEF Doc. Nos. 221-223, 231-233.[FN1]
After considering the procedural history of this case, the papers in support of and in opposition to Motion Sequence [*3]Numbers 1, 2, and 3 (see NYSCEF Doc Nos. 149-151), the testimony of the parties in addition to the three (3) witnesses at trial, the documents admitted into evidence, and the post-trial submissions, the Court hereby makes the following findings of fact and reaches the following conclusions of law.
Relevant Factual and Procedural History
The parties were married on [Redacted], and are the parents of R.D., born [Redacted] (the "Child"). Plaintiff commenced a divorce proceeding by the filing of a Summons and Complaint on January 4, 2019. Pursuant to the parties' Settlement Agreement dated October 2, 2019 ("Settlement Agreement"), the parties agreed that they would share joint legal custody of R.D., with primary residential custody of the Child to Plaintiff, and a liberal and fluid access schedule for Defendant due to the parties' careers as police officers:
The parties shall have joint legal custody, with primary residential custody of the child of the marriage to [Redacted]. As both parties are police officers, it is their present intention that their access with the child shall be reasonably flexible and shall take into consideration each of the parties' work schedule. The parties acknowledge and recognize that the purpose of this parental access arrangement is to enable the child to have a full and meaningful relationship with each parent. Both parties also understand and acknowledge that they will need to coordinate their specific future access with the needs of the child, including but not limited to the child's schooling, religious and social activities that will occur as the child gets older. At all times, the parties agree that the best interests of the child will be their paramount consideration. NYSCEF Doc. No. 29 at 19. The parties were divorced by Judgment of Divorce ("Judgment") entered on December 3, 2019, which incorporated but did not merge the Settlement Agreement.
In May 2020, Defendant relocated from Carmel to New Rochelle and moved in with her girlfriend, [Redacted]. Tr. 4/13, 18:18—25. In December 2021, Defendant resigned, in lieu of termination, from the [Redacted] Police Department.
On September 13, 2021, less than two years after the Judgment, Plaintiff filed an Order to Show Cause (Mot. Seq. No. 1) seeking an Order granting Plaintiff sole legal and physical custody R.D., with final decision-making authority and setting a fixed schedule of access between Plaintiff and Defendant. In her supporting affidavit, Plaintiff claims there has been a substantial change of circumstances. Specifically, in September 2021, the parties knew that Defendant was about to lose her job as a police officer. Consequently, the access schedule for R.D. would no longer work for the parties. NYSCEF Doc. No. 37 at ¶ 8. Plaintiff further cited to Defendant's lack of consistency with respect to access time as well as the Child exhibiting signs of anxiety during access time with Defendant. Id. 
On September 30, 2021, Defendant filed a Cross-Order to Show Cause (Mot. Seq. No. 2), seeking an Order, inter alia, granting Defendant sole legal and physical custody of the Child with final decision-making authority, citing in part to Plaintiff's acts of alienation regarding the relationship between the Child and Defendant.
On November 19, 2021, the Court (Loehr, J.) entered an Interim Order on Access and Visitation on Consent, whereby the parties agreed to a 2-2-3 schedule ("Interim Order"). NYSCEF Doc. No. 73. 
By Order dated November 19, 2021, the Court (Loehr, J.) appointed Dr. Robert Verno to conduct a neutral forensic evaluation on the issues of custody and visitation/access. NYSCEF [*4]Doc. No. 72. Dr. Verno submitted his report to the Court on March 31, 2022 ("Forensic Report"). On November 3, 2022, this Court [FN2]
entered an Order on Consent whereby the parties stipulated that the neutral forensic evaluator report is admitted as evidence-in-chief without the need for independent foundation testimony or evidence. NYSCEF Doc. No. 145.
As of January 1, 2022, Defendant remained unemployed. On February 24, 2022, Defendant filed an Order to Show Cause (Mot. Seq. No. 3), seeking an Order, inter alia, terminating Defendant's child support obligation and granting Defendant the right of first refusal due to her unemployment.
On November 14, 2022, this Court issued a Decision and Order on Mot. Seq. Nos. 1, 2, and 3, referring all issues to a hearing. NYSCEF Doc. Nos. 149—151.
Forensic Report
In connection with the forensic report, Dr. Verno conducted clinical evaluations of the parties and R.D.—each on two separate occasions. He administered the Minnesota Multiphasic Personality Inventory-2 (MMPI2) to both parties and gathered collateral information from Plaintiff's therapist, the Child's therapist, and the Child's pre-school teacher. He also reviewed documents provided by each of the parties consisting of, for example, text messages, legal filings, and at least one recording. 
Dr. Verno recommends that Plaintiff retain physical and joint legal custody of R.D., and that Plaintiff be granted final decision-making authority with regard to R.D.'s elementary, intermediate, and primary education. Dr. Verno further recommends that the interim access schedule continue as per the current 2-2-3 arrangement. Forensic Report at 42. The Court further observes that Dr. Verno made no findings as to alienation by Plaintiff, as argued by Defendant in her moving papers.
With respect to R.D.'s residence and schooling, the Forensic Report states:
Also, at this juncture, [R.D.] appears to have assimilated well into his school ([Redacted] in Mahopac); and it seems that the Carmel area has always been home for him. Given the significant challenge [R.D.] has already endured by having to adapt to two separate homes, and when considering that he is currently functioning at a relatively high level, it would not appear to be in [R.D.]'s best interest (and could potentially place him at risk of psychologically regressing and acting out) to burden him with a challenge of having to give up the familiarity in his life, which would certainly be the case if he were confronted with the prospect of having to change schools and primary residential location. Forensic Report at 42.
With respect to therapy, Dr. Verno recommends: (1) Plaintiff continues her current psychotherapy and explore the negative impact of her troubled childhood on her romantic relationships and on her ability to behave cooperatively with Defendant; (2) Defendant enroll in individual outpatient psychotherapy to explore the possibility of family-of-origin issues negatively impacting her romantic relationships and her ability to behave cooperatively with [*5]Plaintiff; and (3) R.D. continue in his outpatient therapy with [Redacted], and both Plaintiff and Defendant participate in this therapy as per the direction on [Redacted]. Lastly, Dr. Verno recommends the parties enroll in a Parenting Apart class. Forensic Report at 42.
Trial Proceedings
Both parties testified at trial. Plaintiff called [Redacted] (mother of Plaintiff) as her only witness. Defendant called the following two (2) witnesses: [Redacted] (live-in girlfriend of Defendant), and [Redacted] (mother of live-in girlfriend). 
Testimony of Plaintiff
Plaintiff testified that she lives in Carmel, New York, in Putnam County. Plaintiff has been living in the same residence since June 2022 with her parents. Prior to June 2022, Plaintiff was living at a different residence within Carmel and has been a resident of Carmel since 2011. Plaintiff testified that she and Defendant began dating and residing together in Carmel in 2011, before getting married in 2015. At the time of the marriage, both parties were employed by the [Redacted] Police Department.
Plaintiff testified that R.D., who Plaintiff gave birth to in [Redacted], started kindergarten in Carmel in [Redacted]. The Child refers to Plaintiff as "Mom" and to Defendant as "Mommy." Tr. 4/13, 11:19—20.
Plaintiff testified that—at the time the parties entered into the Settlement Agreement—both parties were living in Carmel, where the former marital residence is located, and made a conscious decision to enter into a broad access schedule because of their inconsistent, and often unpredictable, work schedules as police officers. Tr. 4/13, 16:19—17:1. Plaintiff testified that, at some point after the Judgment was entered, Defendant became a sergeant and her schedule was set one month in advance, during which time Defendant had overnights with R.D. "once or twice a week." Tr. 4/13, 18:1—12. In May 2020, Defendant relocated from Carmel to New Rochelle to move in with her girlfriend, [Redacted], with whom she resides as of the time of trial. Tr. 4/13, 18:18—19:4.
Plaintiff testified that she initially filed her Order to Show Cause (Mot. Seq. No. 1) when R.D. was four years old because he began showing signs of anxiety in relation to exchanges between his parents. Prior to scheduled visits between R.D. and Defendant, the Child would vomit, cry excessively, and consistently had a bowel movement right before scheduled pick-up times. Tr. 4/13, 34:7—35:24. Shortly thereafter, the parties agreed that, because R.D. was showing signs of anxiety, they would identify a therapist for the Child. R.D. commenced therapy once a week in September 2021. Plaintiff testified that Defendant initially tried to schedule therapy sessions during her access time, but stopped and therefore, Plaintiff began taking the Child to therapy during her access time every Tuesday. The visits with the therapist changed at some point from once a week to every other week then to once a month, as the Child ceased vomiting prior to exchanges and was showing signs of improvement as to the exchanges between his parents.
Plaintiff testified about the challenges of joint decision making, including, for example, Defendant's pattern of making unilateral decisions regarding matters of religion, education, and extra-curricular activities. For example, Plaintiff testified that Defendant texted Plaintiff asking if she would like to attend R.D.'s baptism, which Defendant had scheduled unilaterally and absent any prior communications. Tr. 4/13, 45:4—9. Plaintiff testified that neither party practiced religion of any kind and the parties did not discuss having the Child baptized during the marriage. Plaintiff testified that she ultimately agreed to attend the baptism because it was [*6]her belief that Defendant would proceed with the baptism, regardless of Plaintiff's agreement or presence. Tr. 4/13, 49:18—25. Plaintiff further testified that Defendant set up a meeting with the church where the baptism was scheduled to be held, but Defendant did not attend the meeting because she was away with her girlfriend. Plaintiff attended the meeting with the Child and Plaintiff's mother.
With respect to education, Plaintiff testified that even though she is and remains the residential custodial parent and has continued to reside in Carmel with R.D., Defendant attempted to enroll the Child in New Rochelle public schools without first discussing the issue with Plaintiff. She testified that Defendant did not disclose that she enrolled the Child in a New Rochelle lottery system for kindergarten until Plaintiff texted Defendant to tell her she enrolled the Child in Carmel public schools. Plaintiff went to the New Rochelle elementary school and showed paperwork that she was the primary residential parent to demonstrate that the Child should not be enrolled in the New Rochelle school district. Tr. 4/13, 73:15—74:14.
Plaintiff testified that the Child has been and is enrolled in extracurricular activities in Carmel. Plaintiff further testified that Defendant enrolled the Child in soccer on Saturdays near Defendant's residence in New Rochelle without Plaintiff's consent. Plaintiff's understanding was that the Child would only attend soccer every other Saturday because the parties alternate Saturdays. However, Plaintiff felt obligated to bring the Child to soccer during her access time on Saturdays because he enjoys playing. Tr. 4/13, 85:4—89:10.
In the course of discussing decision making and the aforementioned examples, among others, Plaintiff testified about the general lack of respect and civility emanating from Defendant. For example, Plaintiff testified as to a May 6, 2020 text message wherein Defendant names her contact in the email address line as "The Devil." Pl. Ex. 1 (Emails and texts between parties re: Covid). In these communications discussing socializing during a period when COVID restrictions were in place, Defendant responded to Plaintiff's concerns about attending a party by stating, "Like I'm done with this shit man; I'm fucking done; I didn't do shit; It's all the fucking haters we work with" and "everything happening to me has nothing to do with my actions. It's all about the people who hate me from the fucking sidelines. . . ." Id. In another example, Plaintiff testified that Defendant frequently blocks her from text messages such that Plaintiff is unable to communicate with Defendant. Tr. 4/13, 112:1—12; see Pl. Ex. 16 (Texts between parties re: Defendant blocking Plaintiff) (Defendant: "My God please don't talk to me anymore. The galaxy you live in is pretty interesting; You wanna see me be unstable? You really better not play with me; I've been nothing but controlled and you're lucky; I'm blocking your number now. You're nothing but a cancer."; Plaintiff: "In case of emergency for [R.D.], don't do that").
Plaintiff is a self-described "gentle parent." Tr. 4/13, 99:19. She testified that she is not aggressive in her parenting style and does not force the Child to do things he is not comfortable with, such as putting his head in the water during swim lessons. Plaintiff further described her disciplinary style as gentle, in that she does not "really yell" and does not punish R.D. Tr. 4/13, 100:5—13. When asked about Defendant's parenting and disciplinary style, Plaintiff testified that the Child is "more obedient" and less conversational with Defendant, whereas Plaintiff described herself as an understanding and patient parent, as well as a good listener. Tr. 4/13, 101:5—102:22.
With respect to Defendant's engagement as a parent, Plaintiff testified that, in December 2021, the Child was at a birthday party and broke his arm. Plaintiff took him to the closest hospital and texted Defendant from the emergency room. Tr. 4/13, 53:13—25. Plaintiff testified [*7]that Defendant did not come to the hospital and did not respond to Plaintiff's text with a request to FaceTime to see the Child while in the hospital, did not come to Plaintiff's house to see the Child once they were at home, and did not attend the doctor appointments, other than one follow-up appointment. Plaintiff further testified that, despite being informed of the Child's annual well visits, Defendant has never attended those medical appointments. Tr. 4/13, 114:14—25. 
Plaintiff testified that a Child Protective Services ("CPS") investigation was prompted when the Child stated at school that Defendant hit him in the mouth because he did not eat. Tr. 4/13, 65:20—66:2. According to the school report, Plaintiff was the "safe parent." According to Plaintiff, after multiple interviews the CPS case was closed, and the family was part of the Family Assessment Response ("FAR") program, which required a house check and a checklist.
Plaintiff testified as to Defendant's reliability as a parent and described an incident on or about [Redacted], 2021. The parties arranged to exchange the Child so that he could attend a party in New Rochelle with Defendant, although the event occurred on Plaintiff's access time. The parties were unable to agree on the exchange time, Plaintiff defaulted to the previously agreed-upon time, and ultimately Defendant canceled the plans. Plaintiff testified, "So this is part of why it's inconsistent. . . You are just—it's not leaving me, it's leaving R.D. You left R.D. Our son thinks he is going to a party, and now I am here left at the exit" with R.D. Tr. 4/13, 111:7—12. 
Plaintiff seeks to modify the current access schedule to alleviate the burden associated with the long drives between Carmel and New Rochelle upon the Child, and particularly in light of the fact that Defendant unilaterally chose to move to New Rochelle when the Child's primary residence is in Carmel. Plaintiff testified that if the parties had 50/50 physical custody and the Child was enrolled in New Rochelle schools, Plaintiff would have to drive him from Carmel to New Rochelle, which would result in the Child being in the car for approximately one hour each way each school day. However, on cross-examination, Plaintiff conceded that she was "happy" with the 50/50 access schedule put into place as of November 19, 2021. Tr. 4/13, 126:8—24. 
On cross-examination, Defense counsel questioned Plaintiff about her availability and her mother's availability to care for the Child in the event he attended New Rochelle schools. Plaintiff agreed that if R.D. attended school in New Rochelle, it would eliminate the need for Plaintiff's mother to care for the Child in that Plaintiff works in New Rochelle and would drive the Child to and from school on her access days. However, Plaintiff's testimony also illustrated numerous instances where Defendant arranged for a third-party non-family member to care for the Child during Defendant's access time. Tr. 4/13, 75:17—79:15. Defense counsel also elicited testimony that it would save the parties $500 per month if they did not have to pay Plaintiff's mother for childcare and that Defendant hypothetically could care for R.D. if or when Plaintiff must work overtime without advance notice.
Testimony of Defendant
Defendant testified that at the time the parties entered into the Settlement Agreement in October 2019, she was employed by the [Redacted] Police Department as a sergeant and her working hours were approximately 4:00 p.m. until 12:00 a.m., while Plaintiff was working more traditional hours of approximately 9:00 a.m. through 5:00 p.m. Tr. 4/14/2023, 94:10—25. The parties agreed that Plaintiff's mother, [Redacted], would provide childcare for R.D., and that Defendant thought Plaintiff's mother was a "long-term solution" relative to childcare for R.D. Tr. 4/14, 97:6—98:6. Defendant asserts that the childcare for R.D. should be modified now due [*8]to her change in work hours, and "beginning a new relationship and becoming very close with my significant other's family." Tr. 4/14, 98:7—15. 
Defendant resigned, in lieu of termination, from the [Redacted] Police Department as of December 31, 2021, as the result of an incident, at which time Defendant told Plaintiff she would be available to be the Child's caretaker, rather than his grandmother. According to Defendant, Plaintiff disagreed and did not "take [her] up on [her] offer." Tr. 4/14, 99:1—7. After resigning from the [Redacted] Police Department, Defendant testified that she unsuccessfully sought employment with other police departments. Tr. 4/14, 99:15—19. Defendant submitted letters to various police departments, but did not receive any responses.
When Defendant realized she would not be able to continue her career as a police officer, she began researching how to open a coffee shop. Defendant testified that she dedicated a significant amount of time to prepare for launching a new business including extensive research, construction, equipment purchase, branding, hiring, and communications with the building and health departments. Tr. 4/14, 102:1—8. Defendant opened a coffee shop in New Rochelle on March 22, 2023. The coffee shop is open Mondays through Fridays from 6:30 A.M. until 5:00 P.M. and Saturdays from 8:00 A.M. until 3:00 P.M. It is closed on Sundays. She testified that she opens the shop at approximately 6:30 A.M. every morning and has two employees working each shift. The shop has eight employees. Throughout the day, Defendant testified she can leave at certain times while her employees operate the shop. Defendant specifically testified that she could leave between 7:00 A.M. and 9:00 A.M. and again between 2:30 P.M. and 5:00 P.M. Tr. 4/21, 7:4—11:2. Defendant stated: "Well, the intention of having eight employees is to make myself more available to be a mother and to be available. And having the employees there creates that opportunity for me. And while they are there, they assume the duties of running the coffee shop. And I'm able to leave, as needed, to address personal matters." Tr. 4/14, 107:1—6.
This Court notes that at the time of Defendant's testimony, the coffee shop had been open for approximately three weeks. With respect to hypothetical questions asked during trial concerning Defendant's availability to care for the Child, the Court specifically stated: "You can ask these questions. But she's already testified that the coffee shop has been opened for less than one month. She's talking in hypotheticals in answering your questions ... I can take it at its hypothetical value in terms of determining how helpful it is." Tr. 4/14, 106:15—21. For example, the Court observes that by Defendant's own admission, the hours of operation of the business had already changed during the three weeks that it was open: "I changed the hours this week. . . because of the profitability of being open from 6:30 to 7:30 was not necessary, in my opinion, as a business owner." Tr. 4/21, 327:4—13.
Defendant presently resides with her live-in girlfriend, whom she has been dating for four years. They have resided together for two years in a home, located in New Rochelle, owned by her girlfriend. Tr. 4/14, 107:7—16. Defendant testified that she relocated to New Rochelle for a variety of reasons including that her girlfriend lives in New Rochelle, it was proximate to her job, and she feels that it provided a "community feeling" rather than an "isolated feeling up in Carmel." Tr. 4/21, 47:1—8. During re-direct, Plaintiff's counsel elicited testimony that Defendant still owns her townhouse in Carmel (the marital residence) within walking distance to Plaintiff's residence and the Child. Defendant testified that she rents out the property.
Defendant testified that if the Court granted her request for sole physical custody and, hypothetically, if the Child attended school in New Rochelle, she would be available to get him ready for school, drive him to school or put him on the bus, and get him off the bus after school. [*9]Tr. 4/14, 103:25—104:12; 105:22—23. Defendant testified that if the Child were to attend New Rochelle schools, it would eliminate the need for childcare, but if Defendant did need childcare, her live-in girlfriend or her girlfriend's mother would assist with childcare needs. Tr. 4/21, 33:19—34:17. 
She further testified, consistent with a text message exchange between the parties concerning her desire to enroll R.D. in New Rochelle schools, that when asked by Plaintiff, "What does that mean for R.D.," her position is "[i]t's the same for him except we are both directly involved and available for pick up and drop off." Pl. Ex. 13 (Texts between parties re: enrollment in New Rochelle schools). Regarding discussion with Plaintiff prior to seeking to enroll R.D. in New Rochelle schools, Defendant testified that "[h]er and I discussed it at work one time." Tr. 4/21, 18:18. When asked to describe the benefits to R.D. attending school in New Rochelle, Defendant testified that both parties are in New Rochelle during school hours, "socialization is more available for a child in New Rochelle," and R.D. engages in activities in New Rochelle including social activities with Defendant's friends—who Defendant agrees are "mostly adults" or relatives of her girlfriend. Tr. 4/21, 86:23—89:7; 101:24.
With respect to R.D.'s extracurricular activities, and specifically soccer, Defendant testified that she signed him up for the [Redacted]. She described discussions with Plaintiff about signing him up as follows: "I sent a link of the [Redacted] to her and expressed that I wanted to sign him up and her thoughts about it. I wasn't given an answer yes or no. I was asked about what we were going to do about paying for it. . . ." Tr. 4/21, 5:11—24. When asked about Plaintiff bringing R.D. to soccer on her access time, Defendant indicated that Plaintiff expressed she did not want to bring the Child to soccer and therefore, she assumed she would not do so. On cross-examination, Defendant conceded that she never informed Plaintiff of the soccer schedule, or asked Plaintiff if she would bring R.D. to soccer on her access time on Saturdays. Tr. 4/21, at 61; see also Pl. Ex. 14 (Texts between the parties re: soccer). 
With respect to other incidents of unilateral decision making, Defendant did not offer testimony as to the decision for R.D. to be baptized, other than to say that she invited Plaintiff and her family to her home after the baptism. Tr. 4/14, 134:8—8—10. 
She further testified that since the implementation of the interim access schedule, the schedule has been working well for the Child and both parties. She testified that, since entering into the Interim Order, her relationship with R.D. is "tremendously positive," and likewise her relationship with Plaintiff has improved. Tr. 4/14, 112:9—25. Specifically, she has observed that the fixed schedule and regular routine has eased the Child's anxiety. She further testified that she has exercised all of her access time pursuant to the Interim Order. 
Regarding parenting style, Defendant testified that she "has fun" with R.D. and enjoys playing sports with him and doing creative activities such as drawing or painting. When asked "what areas as a parent do you think you can improve [sic]?", Defendant answered "Patience. I guess acknowledging his love for video games a little bit more." Tr. 4/14, 120:1—5. 
As to her involvement with R.D.'s care, Defendant testified that she has been involved in R.D.'s treatment by an ENT regarding issues with breathing. Tr. 4/21:2—4. She arranged for R.D. to see the ENT specialist and communicated with Plaintiff thereto; the parties attended one of the three visits together. As a result of the visits, the parties were told that R.D. needed to have surgery, which was performed in Manhattan. Following the surgery, Defendant stated that she and her girlfriend transported R.D. to their home in New Rochelle.
When asked about her approach to co-parenting with Plaintiff, Defendant states, "My [*10]approach to co-parenting is to speak to her about issues with R.D. that come up of concern. Plans, maybe some issues that arise with him, how to approach those issues by co-parenting. Keeping her informed about things that I'm noticing." Tr. 4/21, 121:8—12. Defendant acknowledges that it is important that R.D. observe "cohesiveness" between his parents. Tr. 4/21, 121:8—12. Nevertheless, Defendant conceded that she has blocked Plaintiff from text messaging her on multiple occasions. Tr. 4/21, 67:10—15. She further provided testimony that on one occasion in January 2021, she traveled to Colorado for three days without informing Plaintiff and left the Child in the care of her girlfriend's mother during her access time. Tr. 4/21, 8—21; see Pl. Ex. 11 (Texts between the parties re: third parties picking up the Child). 
Post-Trial Submissions
Plaintiff
Plaintiff argues that Defendant made a unilateral decision to relocate from the parties' home in Carmel to New Rochelle which is approximately fifty (50) miles one way. See NYSCEF Doc. No. 233 (Pl. Post-Tr. Sub.) at 1. To that end, Plaintiff asserts that the Child's travel time should be limited, and that he should not have to sit in a car for hours of transportation every week.
Plaintiff asserts that it is not in the Child's best interests for Defendant to be awarded sole legal and physical custody with final decision-making authority because: (1) Defendant has shown little to no respect for Plaintiff in her role as a parent; (2) Defendant has made unilateral major decisions regarding the Child without consulting Plaintiff; and (3) Defendant has put her own desires ahead of the Child's needs. Id. at 2.
To her first point referenced supra, Plaintiff references Defendant's trial testimony and supporting exhibits demonstrating that Defendant blocked Plaintiff's number, preventing any incoming text messages or phone calls from Plaintiff to Defendant and evidencing Defendant's unwillingness to be respectful of Plaintiff as well as her failure to co-parent. Id. at 3.
With respect to decision-making authority, Plaintiff asserts that since the Judgment of Divorce was entered, Defendant has made several unilateral decisions without consulting Plaintiff including but not limited to, the Child's baptism when the parties never discussed religion, kindergarten registration in New Rochelle when Plaintiff has primary custody of R.D. and lives in Carmel, and registration for soccer in New Rochelle which conflicted with Plaintiff's access time on Saturdays. Id. at 3—6.
Lastly, Plaintiff asserts that Defendant puts her own desires above the needs of the Child in that, for example, she vacationed during her access time without telling Plaintiff, and she moved to New Rochelle to live with her girlfriend rather than choosing to stay within walking distance to the Child in Carmel, and despite having no family support in New Rochelle.
Plaintiff requests that the Court enter an order granting Plaintiff sole legal custody and final decision-making authority with a fixed access schedule for Defendant's visitation with the Child to limit the Child's travel time. Plaintiff requests the following schedule:
• Plaintiff has access time on Monday, Tuesday, Wednesday, Thursday
• Defendant has a Wednesday dinner visit every week, which is to take place in or near Carmel
• Parties alternate access time on Friday, Saturday, Sunday
Defendant
Defendant argues that the best interests of the Child and the entire family will be best served by granting Defendant's request for sole physical and legal custody with final decision-[*11]making authority because (1) a change of custody would allow both parents to spend more time with R.D.; (2) R.D. has more contacts in New Rochelle than in Carmel; and (3) Defendant's work schedule is more flexible than Plaintiff's, and she is more available to care for R.D. NYSCEF Doc. No. 231 (Def. Post-Tr. Sub.) at 2.
Defendant asserts that her proposed custody arrangement will "inevitably result in [the Child] spending less time with his grandparents" but that the "rights of a parent are superior and should be prioritized over all others' rights, and specifically that time spent with a parent is strongly preferred over time spent with a grandparent." Id. at 3.
Defendant states that even though custody should be modified, making Defendant the primary custodial parent, she would like the current access schedule and the holiday access schedule to remain in a final order, maintaining that the current schedule has had a positive effect on the parties' relationship and ability to co-parent and that it has helped ease the Child's anxiety. Id. at 3; NYSCEF Doc. Nos. 73, 127. The current access schedule is 50/50 with primary physical custody to Plaintiff in Carmel. Defendant requests the following 2-2-3 schedule:
• Plaintiff has access on Monday at 9:00 A.M. until Wednesday at 9:00 A.M.
• Defendant has access on Wednesday at 9:00 A.M. until Friday at 9:00 A.M.
• Parties alternate Friday, Saturday, Sunday
Legal Analysis
"In any child custody dispute, the court's paramount concern is to determine, under the totality of the circumstances, what is in the best interests of the child." Matter of Olea v. Diaz, 194 AD3d 721, 722 (2d Dept. 2021); see Eschbach v. Eschbach, 56 NY2d 167, 171 (3d Dept. 1982). There is "no prima facie right to custody of the child in either parent." DRL § 70[a]; DRL § 240 [1][a]. Factors to be considered include, inter alia, "(1) which alternative will best promote stability; (2) the available home environments; (3) the past performance of each parent; (4) each parent's relative fitness, including his or her ability to guide the child, provide for the child's overall well-being, and foster the child's relationship with the noncustodial parent; and (5) the child's desires." Matter of Montebello v. Montebello, 184 AD3d 565, 566 (2d Dept. 2020) (internal quotation marks omitted); see Matter of Olea, 194 AD3d at 722. Importantly, the parent's ability to place the children's needs above his or her own in fostering a continued relationship with the non-custodial parent is an appropriate consideration. Lohmiller v. Lohmiller, 140 AD2d 497 (2d Dept. 1998); Janecka v. Franklin, 150 AD2d 755, 756 (2d Dept. 1989). The Court also considers the availability of each parent to care for and spend time with the child vis-á-vis care for the child by a third-party, which may or may not be a family member. See, e.g., Matter of Cisse v. Graham, 120 AD3d 801 (2d Dept. 2014), aff'd 26 N.Y.S.3d 583 (2016) (a change of the custodial and visitation arrangement made where mother and child lacked quality time together due to work and school schedules).
Joint custody is encouraged "as a voluntary alternative for relatively stable, amicable parents behaving in mature civilized fashion." Braiman v. Braiman, 44 NY2d 584, 589—590 (1978); see Matter of Hreat v. Hreat, 189 AD3d 1237, 1238 (2d Dept. 2020). However, joint custody is inappropriate where "the parties are antagonistic towards each other, do not communicate at all, and have demonstrated an inability to cooperate on matters concerning the child." Matter of Connell-Charleus v. Charleus, 192 AD3d 890, 891 (2d Dept. 2021); see Matter of Laura A.K. v. Timothy M., 204 AD2d 325, 326 (2d Dept. 1994). 
" 'Modification of a court-approved stipulation setting forth terms of custody or [parental [*12]access] is permissible only upon a showing that there has been a change in circumstances such that a modification is necessary to ensure the best interests and welfare of the child.' " Walter v. Walter, 178 AD3d 991, 992 (2d Dept. 2019), quoting Greenberg v. Greenberg, 144 AD3d 625, 629 (2d Dept. 2016). The Court previously ruled that a substantial change of circumstances has been established. Therefore, the instant inquiry is what custody and access arrangement is in the best interests of the Child.
The weight to be afforded to each of the various factors is within the discretion of the trial court and requires an evaluation of testimony, character, and sincerity of all the parties involved. See Bourne v. Birstow, 66 AD3d 621, 622 (2d Dept. 2009). "Inasmuch as custody determinations depend to a great extent upon an assessment of the character and credibility of the parties and witnesses, deference is accorded to the hearing court's findings in this regard," R.K. v R.G., 169 AD3d 892, 894 (2d Dept. 2019), and "[t]he court's findings will not be disturbed unless they lack a sound and substantial basis in the record." Id. at 894; see Eschbach, 56 NY2d at 173—174 (1982). The trial court's assessment of the credibility of witnesses and evidence is afforded great weight on appeal. See Alper v. Alper, 77 AD3d 694 (2d Dept. 2010). Credibility
Both parties offered testimony at trial and were subject to direct and cross-examination by opposing counsel. The Court recognizes that both parties are loving towards their child, and suitable as caregivers. See also Forensic Report at 3 ("Each of [R.D.'s] mothers, in turn, were observed as being affectionate with and loving towards R.D."). Plaintiff presented as calm, even-tempered, thoughtful, and articulate in her answers—including with respect to the disposition she is seeking, and knowledgeable as to the Child's needs. She came across as self-aware of her own strengths and weakness, as well as her parenting style and how the parties' respective actions and behavior affect the Child. See, e.g., Tr. 4/13, 111:7—17 ("You know, now you have a disappointed kid. And it might sound little, but when it's on a, you know, enough—when it happens enough times, this kid gets disappointed, and he is just, you know, it messes, it contributes to the anxiety."). Plaintiff appeared to answer each question truthfully; she was forthcoming and cooperative.
Defendant presented as calm and mild-mannered in her demeanor. However, she came across as guarded, "emotionally aloof," and less detailed in her answers. The Court observes that the Forensic Report made similar observations as to Defendant's demeanor. Forensic Report at 9. Certain of her answers on cross-examination were evasive and flippant. See, e.g., Tr. 4/21, 85:18—89:11. Additionally, Defendant's testimony seems inherently contradictory in several respects. For example, Defendant maintains that if she were granted sole physical custody, the Child would attend New Rochelle schools and it would eliminate the need for childcare, but stated that she is at her business every morning for opening while the Child is at home sleeping. With respect to Defendant's argument that primary custody to Defendant would save the parties in childcare costs, Plaintiff testified that although the parties stipulated to pay Plaintiff's mother $500 per month to care for R.D., Defendant has not paid her share of $250 per month since January 2022. See Tr. 4/14, 10:24—11:4; 48:14—23.
More striking to this Court, however, is Defendant's unfledged and dismissive attitude as substantiated by the evidence—in the form of communications and testimony—offered at trial. For example, Defendant admits to blocking Plaintiff from text message communications on more than one occasion. Defendant further appears to lack insight into her own strength and weaknesses in that she consistently views herself as a victim. See, e.g., Pl. Ex. 1 ("And [*13]everything happening to me has nothing to do with my actions."). This observation is consistent with that of the Forensic Report, which states, "Just as [Defendant] seemed to view herself as a victim with regard to the loss of her job, she appeared to do the same as she discussed the demise of her marriage to [Redacted]." Forensic Report at 11.
Best Interests of the Child
The Court, having found a change in circumstances that warrants a modification of custody, turns to the determination of the best interests of the Children. While the Court may, in its discretion, consider a variety of factors that bear upon the best interests of the child in a custody determination, the following non-exhaustive factors are of particular relevance here: which parent has historically acted as the primary caregiver, the stability of the parents, the ability to provide for the intellectual and emotional needs of the child, a demonstrated willingness to prioritize the needs of the child over the parties' own needs, a willingness to foster a relationship with the non-custodial parent, and the availability of the parents to care for the child.
Undoubtedly, Plaintiff and R.D. have deep ties to their residence in Carmel. Plaintiff has resided continuously in Carmel since 2011, when she began her relationship with Defendant; Defendant lived in Carmel from at least 2011 through May 2020. R.D. has lived in Carmel for his entire life. Plaintiff is close to and well-supported by her parents, with whom she and R.D. have lived since June 2022 in a home that Plaintiff owns. Plaintiff has maintained steady employment by the [Redacted] Police Department. As related to the Child, the parties explicitly agreed that Plaintiff's mother would be an appropriate caregiver for R.D. and neither party disputes that [Redacted] has cared for R.D. consistently per that agreement, including by preparing meals and transporting him to and from school. Defendant did not offer any evidence at trial that calls into question Plaintiff's stability as a parent, historical role as the primary caregiver, ability to prioritize R.D.'s needs above her own, and availability to care for the Child. Furthermore, Defendant did not offer any evidence at trial to substantiate the assertions set forth in her Affirmation in support of her application seeking sole legal and physical custody, that Plaintiff has failed to foster a relationship between R.D. and Defendant, and that Plaintiff has alienated R.D. from Defendant. See NYSCEF Doc No. 48 (Def. Aff.) at ¶¶ 15, 19, 34.
Throughout R.D.'s lifetime and this proceeding, Plaintiff has acted as the primary physical custodian and has demonstrated the ability to maintain and promote stability in the Child's life and home environment. She has taken proactive measures to enroll R.D. in therapy to address the anxiety R.D. experienced, which was—at least in part—attributed to the transitions between both parents and the absence of a fixed access schedule. She consented to a fixed access schedule to afford R.D. greater consistency and routine in his schedule, even though it reduced her access time with R.D., because she chose to prioritize the best interests of R.D. Plaintiff has undoubtedly acted as the primary caregiver to R.D. since birth, and consistently provides for R.D.'s emotional and intellectual needs. See McFarlane v. Jones, 193 AD3d 936 (2d Dept. 2021) (affirming an award of physical custody where "the father was better able to promote stability in the child's life and provide for the child's overall well-being, and that the father was more likely to foster the child's relationship with the mother"). 
The Court does not dispute that Defendant is also a suitable and fit parent to R.D.; however, Defendant has not demonstrated stability and reliability in her role as a parent. At bottom, Defendant unilaterally chose to relocate from Carmel to New Rochelle, where she now resides with her girlfriend in a home owned by her girlfriend, to serve her own interests and [*14]without any consideration of how her decision would impact R.D. and her ability to effectively care for him. For example, by Defendant's own admission, her choice to move to New Rochelle negatively impacts the Child's availability to participate in after-school activities and socialization, such as playdates. Tr. 4/21, 48:1—5. Her relocation has also interfered with her ability to participate in R.D.'s therapy sessions. Tr. 4/13, 38:15—39:2. Additionally, based on the interim access schedule, assuming arguendo that the drive from Carmel to New Rochelle is one hour, R.D. is spending four hours in the car during a three-day period (Wednesday through Friday during Defendant's access time) and this time does not account for the additional time spent in the car during alternating weekend access time.
The Court is troubled by Defendant's established pattern and practice of making unilateral decisions without due consideration of its impact on R.D. and her inability to effectively co-parent with Plaintiff. The examples of such unilateral decisions abound, and are not simply remote events. Defendant arranged for the Child's baptism without first discussing the matter with Plaintiff. See Matter of Alexis W.W. v. Adam X.X., 220 AD3d 1094 (2d. Dept. 2023) ("The parties resided in different counties and the prior order would soon become unworkable upon the child entering kindergarten [. . .] the acrimony was further exacerbated by the father's unilateral decision-making including, inter alia, having the child baptized without input from the mother as to the choice of religion [. . .] we find that the relationship has deteriorated to such an extent that the parties are unable to communicate in a reasonable manner for the benefit of the child. "). Defendant sought to enroll R.D. in New Rochelle schools without first consulting with Plaintiff. See Graffagnino v. Esposito, No. 2021-05854, — N.Y.S.3d &mdash, 2024 WL 253208, at *2 (2d Dept. Jan. 24, 2024) (increasing father's access time where the testimony at trial established, among other things, that the mother had enrolled "the child in a school without consulting or even informing the father").
Most pronounced to this Court is Defendant's rationale for R.D. attending New Rochelle schools as articulated in the following exchange: Plaintiff: "I can see how that's convenient for us parents. What does that mean for [R.D.]?; Defendant: "It's the same for him except we are both directly involved and available for pick up and drop off." Pl. Ex. 13. Consistent with the observations and findings of the Forensic Report, it is clear that Defendant has given no consideration to R.D.'s best interests as related to changing his school district, or the toll of weekday travel on R.D. See Forensic Report. at 42. Defendant does not consider the following non-exhaustive factors: travel time, adapting to a new school, adapting to new friends, the ability to participate in after-school activities, the ability to socialize with his peers, or adapting from his primary home in Carmel to two separate homes in two separate communities.
Defendant testified that, in New Rochelle, R.D. has relationships with various adults, many of whom are Defendant's girlfriend's family members, and some children. Of the twelve individuals named, only two of them were children. Tr. 4/21, 101:5—25. Further, Defendant conceded that if her and her current girlfriend decided to terminate their relationship, she does not have housing in New Rochelle. Tr. 4/21, 45:15—19. Other than the fact that Defendant resides in New Rochelle, it is apparent to this Court that the Child has no ties to New Rochelle. In fact, when asked about her reason for moving to New Rochelle, Defendant listed reasons that benefit Defendant directly, and not the Child:
Q: Those specifically with [R.D.], how is it in [R.D.]'s best interest for you to have moved an hour away from him when you used to live in walking distance?
A: [R.D.] has a lot of people around him who love him and who do things with him. [*15]There's a lot of things going on in New Rochelle, Larchmont, Mamaroneck that we take part in every week that is just not the same in Carmel. I did live in Carmel for many years, I took note of the isolated feeling being up there, not having roots in New Rochelle, not knowing  excuse me not having roots in Carmel or knowing anybody in Carmel.
Q: Again, that's about you?
A: It is about.
Q: It's about you, correct?
A: I am the one who has [R.D.] hangout with people, make play dates, do things.
Q: That can't be done in Carmel?
A: I found it difficult to in Carmel to do those things.
Tr. 4/21, 47:11—48:13.
Defendant asserts that by sharing physical custody and moving R.D. to the New Rochelle School District, it would result in more time spent with both parents. In doing so, she refers to the Matter of Cisse, 120 AD3d 801, wherein the Second Department upheld a decision modifying a prior order of custody and visitation so as to award the father custody of the child. In that case, the father relocated from Queens—where the mother resided with the child—to West Babylon, Suffolk County; the child attended school in Manhattan. At the time of the post-judgement proceeding, the father resided in West Babylon with his wife and their three children. The mother testified that as a result of her less flexible work schedule, on days when she has access time, she leaves early from Queens to drop off the child to school in Manhattan, and picks the child up from school in Manhattan at 6:00 p.m. and returns to Queens. Id. at 804. The Court granted the modification of custody and access based upon a variety of factors including, the mother's prior interference with the father's visitation, id., at 803, the parties' work schedules, id. at 804, the child attending school in a location far from both of his parents' homes, the mother's failure "to strike a proper balance between the child's academics and her need to socialize with her own peers," id., the child's articulated preferences including "a sense of loneliness when she is with the mother," id. at 805, and the child's integration in the West Babylon community, id. These factors are not analogous to the present case and, in fact, rebut Defendant's position.
With respect to the availability of each parent, it is axiomatic that the Court should prioritize a child's time spent with natural parents. However, this Court finds that the testimony of Defendant did not establish that she has availability to care for the Child in lieu of third-party caregivers and/or R.D.'s grandmother. In fact, Defendant's testimony as to her availability is wholly speculative. Her business officially opened in March 2023, a mere three weeks before trial. Defendant's work hours, income, staff, and daily operations of the business are all fluid. Defendant has no track record or experience in the food and/or restaurant industry, and therefore cannot anticipate the operations, let alone the ebbs and flows of her business. Defendant appears to have the ill-conceived notion that she can manage an unestablished business while providing meaningful attention to R.D. at his young age. At bottom, Defendant asks this Court to fashion a custody arrangement and access schedule that requires R.D. change school districts from Carmel to New Rochelle based on pure speculation as to her work schedule and availability to care for the Child.
For example, Defendant testified that she would bring R.D. to the coffee shop with her during after-school hours on her access time, which would eliminate the need for Plaintiff's mother to care for the Child. Tr. 4/21, 106:8—13. From the Court's perspective, this is not an [*16]ideal scenario in that the Child is not enrolled in an after-school program, which would allow him to interact with peers of his age, and it does not provide for quality time with a parent. See Matter of Cisse, 120 AD3d at 803 ("the mother acknowledged that her new work schedule and the child's school schedule leave little time for them to spend quality time together during the school/work week"). In the alternative, R.D. could go directly home from school in Carmel to do homework, decompress, socialize with peers, and/or participate in extracurriculars near his home. Accordingly, the Court finds that, based upon the parties' testimony, Defendant's availability to spend "more continuous quality time" with R.D. is wholly speculative.
With respect to decision-making, the record is clear that Defendant has failed to consult with Plaintiff regarding major decisions such as those related to religion and education. Although, at the time of trial, the parties testified that their communications have improved—largely due to the implementation of a fixed access schedule—the fact remains that Defendant has made and attempted to make significant decisions that directly affect R.D. without involving Plaintiff. Despite her testimony that she believes it is important that R.D. observe "cohesiveness" between his parents and the parties communicate regarding issues concerning the Child, "the record is replete with examples of hostility and antagonism between the parties, indicating an inability to put aside differences for the good of the child." Pierce v. Caputo, 214 AD3d 877, 879 (2d. Dept. 2023) (internal citations omitted).
Ultimately, this Court must determine the legal and physical custody arrangement and access schedule that best serves the interests and welfare of the Child, and finds that the evidence here establishes that Plaintiff is the more capable parent and likely to serve the Child's best interests. The Court, guided by an analysis of what is in the best interests of the child, finds that it is in the best interests of R.D. that Plaintiff shall have primary physical custody of R.D. subject to the access schedule as set forth infra.
The Court further directs that the parties maintain joint legal custody of R.D., and that following meaningful consultation with Defendant, Plaintiff shall have final decision-making authority as to all major matters including medical, dental, psychological, psychiatric, religion, education, and extra-curricular activities. Consultation shall mean that each party shall convey to the other party her opinions on whatever matters affecting the Child need to be resolved in writing, setting forth the issue that needs to be resolved and that parent's proposed resolution at least three (3) days in advance of such decision being made. Final decision on that issue shall not be made until after consideration of the other parent's position, and a written response to same is made. The parties are encouraged to defer to the professional in whatever field requires determination. In case of a medical emergency, each parent shall immediately, or as soon as practicable, notify the other. In such cases, the parent who has custody of the Child is authorized to make emergent decisions consistent with the recommendations of the then present medical provider.
Access Schedule
This Court rejects Defendant's contention that the access arrangement set forth in the Interim Order (NYSCEF Doc. No. 73) should remain on the basis that the access schedule has had a positive effect on the Child and changing it will probably prove to be detrimental to his mental health. While the Court accords some weight to the opinion and recommendations of the Forensic Report, "they are not determinative and do not usurp the judgment of the trial judge." Koslowski v. Mangialino, 36 AD3d 916, 917 (2d Dept. 2007). Here, the Forensic Report recommends that the current 2-2-3 access schedule continue.
The Court finds that the current access is not sustainable for R.D. in the long-term given that he attends school in Carmel. Further, the interim access schedule would be logically inconsistent with the Court's decision as set forth herein that, among other reasons, it is not in R.D.'s best interests to be subject to lengthy weekday travel times to accommodate Defendant's lifestyle. Rather, the Child's need for a stable home environment, school life, and community will become increasingly important as he ages. He cannot be expected to live in two separate homes fifty miles apart on a 50/50 basis. Further, the Court observes that there is consensus that both R.D. and the parties have benefited from a fixed access schedule—the Court is unconvinced that the current formulate of a fixed access is in the best interests of the Child.
In fashioning an access schedule, the Court considers the stability and predictability of the schedule, the number of exchanges, and the age of the Child. Accordingly, the Court directs that the parties adhere to the following:
• Plaintiff Mother shall commence access with the Child on every Monday at school drop off (or 9:00 a.m. if no school) through Wednesday school drop-off (or 3:00 p.m. if no school)
• Defendant Mother shall have access with the Child every Wednesday from school pick-up (or 3:00 p.m. if no school) through Thursday at school drop-off (or 3:00 p.m. if no school)
• Plaintiff Mother shall have access with the Child every Thursday from school pick up (or 3:00 p.m. if no school) through Friday at school drop-off (or 3:00 p.m. if no school)
• The parties shall alternate access with the Child on weekends from Friday at school pick up (or 3:00 p.m. if no school) through Monday at school drop off (or 9:00 a.m. if no school)
Although there was testimony throughout trial from the parties about R.D. attending summer camp in New Rochelle, there was also testimony from [Redacted], who works at the camp, that the camp only accepts children up to five years old and therefore R.D. is no longer eligible to attend. For that reason, the Court will not address summer camp at this time and orders the parents to meet and confer and come to a decision for summer camp that is in the best interest of R.D.
Regarding holiday and summer access, the Court directs that the Pendente Lite Stipulation Regarding Holiday and Summer Access, entered on July 1, 2022 (NYSCEF Doc. No. 127), is implemented on a final basis.
Accordingly, it is hereby,
ORDERED that the Court grants Plaintiff's Motion Sequence Number 1 to the extent that the Court modifies the parties' Stipulation and Order Regarding Custody, Access and Child Support, dated October 2, 2019 ("October 2019 Stipulation") and Judgment of Divorce so as to award primary physical custody of the parties' child, R.D. (born [Redacted]) (the "Child") to Plaintiff [Redacted], subject to the access schedule set forth herein and effective February 5, 2024, and final decision making to Plaintiff subject to meaningful consultation with Defendant; and it is further
ORDERED that the Court grants the branch of Defendant's Motion Sequence Number 2 seeking a fixed access schedule as set forth herein, and denies the remaining relief sought in Motion Sequence Number 2; and it is further,
ORDERED that the Court denies Defendant's Motion Sequence Number 3 as moot in light of her current employment, except to the extent Defendant still seeks a modification of her [*17]child support obligations during the period she was unemployed; and it is further,
ORDERED that counsel shall appear for a pre-trial conference on March 5, 2024 at 9:30 a.m. in Courtroom 1002 as to the issue of child support in light of the Court's modification of custody and access as set forth herein; and it is further,
ORDERED that all other relief requested and not decided herein in denied.
The foregoing constitutes the Decision and Order of this Court.
Dated: January 26, 2024
White Plains, New York
HON. ANAR RATHOD PATEL, A.J.S.C.

Footnotes

Footnote 1:The Court previously ruled that the excess pages of Defendant's brief, which were filed in direct contravention of the Court's directives, will be disregarded. See NYSCEF Doc. No. 236.

Footnote 2:On July 18, 2022, the case was reassigned from the Honorable Melissa A. Loehr to the Honorable John P. Colangelo. On October 3, 2022, the case was reassigned to this Court. The parties appeared for the first time before this Court on October 11, 2022, at which time this Court ordered that Mot. Seq. Nos. 1, 2, and 3 be deemed fully submitted. See NYSCEF Doc. No. 138.